at all. Argument not to exceed 15 minutes per side. Ms. Hermendorfer, you may proceed. May I proceed, Your Honor? Good morning, Your Honors. Whitney Hermendorfer for the State of Tennessee would like to reserve three minutes for rebuttal. For decades, Tennessee's Title X program has used federal funding to help needy residents access important services like contraception, STI testing, and cancer screening. For just as long, Section 1008 of Title X has directed that funds cannot flow to programs where abortion is a method of family planning. There are no other abortion-related conditions on funding in the statute. Yet now, HHS has stripped Tennessee's Title X funding using an abortion counseling and referral condition HHS unilaterally created. Because Tennessee will not use its own state employees to facilitate the elective termination of unborn life, HHS pulled Tennessee's grant and gave the money to Planned Parenthood. That decision violated the Spending Clause Clear Statement Rule because HHS's abortion condition is not in the statute as this Court's Kentucky v. Yellen case instructs that it must be. You know, just on that point, Kentucky v. Yellen, that part of the opinion seems to be on its face dictum. The Court is responding to an argument that the agency didn't make in that case, which namely that the regulation would provide the requisite clarity rather than the statute. And so that whole analysis begins with even if. And it just seems to be patently dictum. Am I mistaken about that? So I disagree because I think the reason the Court went on to address that point, Your Honor, is because it noted that there was some question about whether the government could waive reliance on Chevron in that case. So I believe that's the first point that the Court did determine that it was necessary to fully resolve the case and the arguments that Treasury was making there. Number two, if Treasury's argument were right, then one would have thought that the regulations themselves would have mooted out the entire case. Because moving forward, there would have been clear notice about the funding requirement. And as the dissenters in those proceedings pointed out at the en banc phase of that case, the condition had not actually been imposed against any of the states in that matter. So I think that theory butts up against what the Court actually did hold with respect to mootness. Well, I mean, I don't really, I mean, that's not what the Court did in the panel opinion, though. I mean, the panel opinion, they don't reach this question for the mootness reason you just said. They just say, but we note that even if we were bound to independently assess whether Treasury's rule could provide clear notice, you know, we still, we still would hold, would hold, not hold, would hold. And so it just seems, you know, I mean, it doesn't mean it's unpersuasive or whatever, but yet this Kentucky v. Yellen's being cited as, you know, some sort of like, you know, leading authority on this issue. And I kind of doubt that it is. Well, I suppose I'll stand by my argument with respect to why the Court went on. It wasn't purely advisory. There was question about whether the government could appropriately waive Chevron. But Yellen is not the only egg in our basket, Your Honor. Yellen aligns with other cases like it from the Fourth Circuit, the Fifth Circuit, the Eleventh Circuit. And all of those cases are on par with Yellen's very persuasive reasoning at a minimum that provides that an agency cannot impose an after-the-fact condition that is absent from the statute. And the reason is twofold, both because of the notice principles that underlie the Spending Clause Clear Statement Rule, and also as a matter of non-delegation and separation of powers concerns that the sister circuits have set out very persuasively. So that's one thing I wanted to ask for your help on. So a part, because some cases talk about notice with respect to the Clear Statement Rule regarding the condition. And at least Yellen talks about non-delegation. And so can you just tell me which cases, let's just set aside, I'm not interested in any cases for this question that are just talking about notice. Which of these cases that are kind of cited throughout your brief actually invoke this Clear Statement Rule as to the Spending Clause, not as to something else, for purposes of a delegation analysis? So all of the cases that we've cited in our brief on the notice point, Your Honor, so I'm talking about West Virginia, Exeril, Morrissey. Very recently the Fifth Circuit decided Texas versus Yellen, which is its version of Kentucky versus Yellen. That was in our 28J. That was recently filed in response to the Oklahoma case, which Oklahoma, you know, looms large. The budget was issued Monday, so I do want to talk about that. Also, Judge Luttig's opinion in the Fourth Circuit in Riley, that was adopted by the en banc court there, talks about non-delegation and the separation of powers principle. So too Texas Education Association in the Fifth Circuit. And so the reason why this is important when we're thinking about the interaction between regulations and the statute is the Constitution vests Congress with the spending power and what Yellen really got at was how concerning it would be if there were an open ended delegation that the agency could provide content to. And so those are the cases that are in our favor. Of course, Ohio itself, Ohio versus Becerra, talks about kind of the major question dimension of this potentially and how that interacts with whether you want to call it non-delegation or elephant and mousles. It's just the plausibility of Congress delegating through kind of an open ended provision, this type of condition. And so what I want to get to that I think is very important to understanding why HHS and with respect to the Oklahoma decision was incorrect or incorrect is they are misreading all of the spending clause cases that are cited. And that's not an exaggeration because in no other case, and I can walk through them as quickly as I can, was the condition in question being set by the agency referring back only to an open ended rule making delegation. So I can go through these. So in each case, the statute, like Bennett, the statute itself says here's the condition the agency might do a me too, but the statute made it clear. And so your argument, so I understand it, is it's not enough for the statute to say there shall be a condition and ask the agency what it is. You're saying at least as to, you know, and this is kind of CF territory now, at least as to a major question, the statute must prescribe the condition or something close to it. So that is the top line kind of 30,000 foot view of the principles that we're advancing here. And with respect to just these cases, I think two things are going on. And some of them, like in Bennett is a great example, the court there expressly said we find Title 1 itself clear. But it then used the regulations to bolster that understanding of what the statute meant. But when it got down to this point about whether an agency could after the fact articulate a condition, it said, quote, we're reluctant to conclude that the states must, quote, satisfy whatever terms of Title 1 might later be adopted by the Secretary. That's the Supreme Court at page 670 of Bennett. So Davis was another case the 11th Circuit cited, I'm sorry, the 10th Circuit cited, and the District Court did too. There the 639 and 47, that the conduct at issue was an intentional violation of the statute. And it said, quote, it violates the clear terms of the statute. Harris is a case, so Yellen talked about two examples of mere implementation details. And I think this is the divide you were getting at, Judge Kethledge, between whether we want to call it a major question, Judge Ludig and Riley called it something that invades the 10th Amendment prerogative or powers reserved to the states. Certainly after Dobbs, abortion regulation is one of those powers. That's on one side of the line. When you're talking about that type of a condition, we do expect Congress to speak clearly. On the other side of the line, there are cases, and we do not contest that an agency can pass rules with respect to spending clause statutes. That's not our position to call all of those into question. But when you look at what Yellen cited of what those types of cases are, it gave two examples. It gave the Harris case. This is at page 353 and 354 of Yellen. There the statute said the state could competitively bid for medical devices, and the only regulation was defining what medical devices meant. So too, and Miami University also cited at Yellen. It was about a FERPA provision, about a law enforcement unit. That was the statute. The regulation only clarified what law enforcement unit meant. So those are the types of clarifying regulations agencies have the power to adopt. But here, all HHS has pointed to is its boiler plate rulemaking delegation that says you shall follow any conditions, and this is 300 A-4, any conditions the secretary may promulgate. The boiler plate delegation, at least in 1006, since it's not the only issue in the case. With regard to 1008, our court in the Ohio case found itself in a position where it was bound by Russ's determination that the statute was ambiguous and that the agency, it was bound more specifically by Russ's determination that the agency was entitled to deference as to what 1008 meant. So that's not true anymore. You in your brief, page 41, I just happened to read it recently, you reserve the argument that the referral and counseling requirements are contrary to law under the APA. That's your first claim in your complaint. And I want to get your thoughts about the posture of that issue. This is a preliminary injunction appeal, so we don't want to just be sending things back and forth. You have preserved that issue probably, but it sure isn't the focus of the briefing. So what's your sense of the posture of that question in this preliminary injunction appeal? So I think we've preserved, obviously preserved that top line argument. We have advanced all of the same reasons under step two of Chevron, which no longer applies, why the statute can't be read this way. All of those apply with equal and then greater force now that in our view we have a de novo shot at what section 1008 of title 10 and the statutory structure around its support. I think the government's Loper-Bright, post-Loper-Bright filing suggested that this court would remain bound by Ohio and Rust. I think that's wrong. I think the court in Loper-Bright used very careful language. About the statutory stare decisis effect. And in particular, your honor, I would point you to Loper-Bright only with respect to holdings that quote, specific agency actions are lawful. So what Loper was doing, I submit to the court, was closing off collateral attack on any number of prior rules and adjudications. Action is a term of art in administrative law, correct? That's right. So in this instance, they would be talking about the 1988 rule, right? With respect to Rust and the facial in the 2021 rule with respect to Ohio, I don't think Ohio would be binding in the same way because statutory stare decisis principles don't work the same way at the circuit level. But just, I can reserve the remainder of my time or Can I ask one more question? Sure. Did you have a question? No, I was going to Oh, you were going to ask Hyatt a question. No, I was going to, I was trying to bring us to a solid court Can I ask one, if I can remember what it was. I'm having a moment. I guess I'll, oh, the counseling requirement, okay? So you object to the counseling requirement as inconsistent with 1008 as well as referral. I understand your argument as to referral. Counseling, I'm not, how do you, so we have this rider that gets passed every year or at least for many years with the appropriation for title eight. And it says that, all right, it says the amounts provided to said projects under such title shall not be expended for abortions, that all pregnancy counseling shall not be non-directive. And then it talks about don't say mean things about elected officials. All right. And so why doesn't, I mean, this rider all but says that non-directive pregnancy counseling is permitted. Why shouldn't we read this with 1008 to mean that, you know, the counseling is okay? So two reasons. Of course it doesn't, it uses pregnancy, all pregnancy counseling. Right. But sure, I mean, pregnancy, it's in the same breath as no money for abortions. I mean, in context, I mean, what else are they talking about? Or at least what they're talking about, pregnancy counseling, like people are, a person, a woman is pregnant and now there's counseling and they're saying it's going to be non-directive. As to what? I mean, surely it includes at least abortion. So it may include abortion. And I do think this is an important point about just what section 1008. So I do not think you have to go all the way of the other direction and basically reimpose the reading of the 1988 rule to rule for us in this case. And by that I mean, if we're right about section 1008, all that needs to mean is that HHS can't pose a mandatory requirement on all of the states. Well, but the 2019 rule itself points to this rider and it says, I mean, I don't have the page number handy, it's here somewhere. I mean, the 2019 rule says that we have to read these together. It's a pretty thoughtful analysis. And it says that in light of the rider, that does not violate 1008, period. And if it doesn't violate 1008, I don't see why it matters whether the rule says it's permissive or required. It doesn't violate 1008. That's what the agency said then. I mean, why is that wrong? That's a rule that Tennessee didn't really have a problem with, presumably. I mean, it's basically the Rust rule. Well, Rust barred counseling as well, Your Honor. Yeah. Well, they changed it though because in the meantime we had the rider. So that's a good point. You're right as to, yeah. But anyway, in the meantime we had the rider. Obviously this was kind of back burner in terms of the rider and section 1008 because we were stuck in Chevron Step 2 land. But I think the dimension of would an appropriations rider that doesn't specifically mention abortion be enough to satisfy, whether you want to call it elephants in mouse holes, non-delegation. And I'd point, Your Honor, to the government's cert petition and the title 10 cases that were granted to explain why it's suspect to read after the fact rider to create that type of override. I think those same principles would govern onto why so too you cannot use that type of rider to impose a mandatory requirement onto the states that overrides their abortion policies. That's a concise answer. Thank you for your indulgence. Thank you, Judge Givens. Good morning and may it please the Court, Courtney Dixon for the Secretary. The 10th Circuit on Monday rejected a parallel challenge brought by Oklahoma. It walked through materially identical spending clause arguments raised by Tennessee here and rejected them under Supreme Court precedent. On the APA arguments, it recognized correctly that Rust is finding precedent. It cited this Court's opinion in Ohio versus Becerra persuasively and it rejected those arguments as well. This Court should follow the 10th Circuit's decision and the District Court's very thorough decision in this case and affirm the denial of a preliminary injunction. What about Tennessee's position that really statutory stare decisis works differently at the circuit level than it does at the Supreme Court level? The Supreme Court was very clear and low for bright that it was not calling into question prior cases relying on the Chevron framework. It wasn't that broad. It said we give statutory stare decisis effect to specific agency actions found lawful. So it means if we had a case with the 1988 rule, it's lawful. We can't touch it. Even if all the premises of that decision have been obliterated by a later Supreme Court case, we can't touch it. So it's just about action. It's a term of art. This case, we don't have prior agency action that the Supreme Court has found lawful. The stare decisis effect that the Chief Justice very carefully described just doesn't apply here. We have rust as a decision from the Supreme Court. Which is a Chevron case to its bones. The Supreme Court in that case heard arguments from both sides and it interpreted Section 1008 and said Section 1008 does not speak to counseling and reform. So they overruled Chevron, which means we do interpret it now. We say what it means. They said in that case, they said we're not going to be detained by the plain language and they say it's ambiguous. Even if that's true, if somebody says it's contrary to law, Your Honor, this requirement is contrary to 1008. Even if the court said it was ambiguous as an intermediate conclusion in that case, we must now, to honor Loper Bright, we must say what it actually means. Balls and strikes. The Supreme Court has stated, obviously, over and over in many contexts that it is up to the Supreme Court to overrule its own precedent, not lower courts, even if it's been called into question. What would we be inconsistent with? They upheld in Rust a rule which was the opposite of this rule. In doing so, Your Honor, again, considered arguments on both sides about the statute and said Section 1008 does not speak to counseling and referral. So I'll point this court again to the Ohio v. Becerra opinion from last year. Well, let's say I disagree with you on that and that Rust, let's just hypothetically say Rust is not binding. I'll ask you the same thing that I asked your friend. What do we make now of the posture of their claim that the referral and counseling requirement is contrary to law under the APA because it violates 1008? In the sense of the posture of that here. I mean, they've made that, they've preserved it. The ground shifted, obviously, in a fundamental way during the pendency of this very appeal. So what do we do about this? How do we adjudicate it? In terms of the posture, obviously, this court is here on the denial of a preliminary injunction. That's understood at the time the district court made its decision. And again, I would reiterate that the precedent for purposes of this court is the same as it was before. Let's say I disagree with you on that. And I'm referring, Your Honor, to the posture of this case. We're here on the denial of a preliminary injunction. The district court applied binding precedent and it denied the preliminary injunction to the extent that there are open questions about the best meaning of the statute. They're not really fully fleshed out here today. But again, I would emphasize the Tenth Circuit, again, just on Monday, recognized that Rust remains presidential and decided this court is going to keep it away. Well, you know, we're going to decide that for ourselves here. I mean, at some point in this era, the agency needs to realize that we're actually going to answer these questions. And this might be such an appeal. All I'm saying is for... I'm kind of asking you, how should we go about, if we were to adjudicate the merits question of what 1008 means and whether this requirement violates it, if we actually were to interpret the statute, how should we go about that? You didn't want to brief it. And I'm not giving you a hard time about that. I'm asking for your help. How would we do that? Should we get more briefing? I mean, what's your thought? I mean, again, Your Honor, we're pushing up against the fiscal year deadline. I know that. Both sides have asked for a quick ruling. Again, the district court, you know, denied based on the law at the time. If the court wants... Go ahead with what you have. I'm going to ask you to speak up a little bit. And I'm going to ask Judge Kethledge to wait until you finish your... I'm having a hard time listening to you. I apologize, Judge Gibbons. Yeah, I don't mean to cut you off, but go ahead. No, I mean, obviously, our top line answer is that Rust and Ohio remain binding precedent on this court. It's not up to this court to overrule the Supreme Court's decision. Ohio applied Rust and said, we're bound by Rust. This is the outcome. The same is true for the panel here today. That's our top line argument. Obviously... I understand you to be saying... I think part of what Judge Kethledge was asking you is if we wanted some additional briefing from the parties, particularly from you on this issue, your position is based upon this timing deadline, you don't think that's a good idea? I don't think it's a good idea because of binding precedent. Obviously, if the court would like further briefing on the meaning of the statute, we are happy to provide the information that the court wants, understanding the deadline both parties have asked for an expeditious decision here. Again, I think this court can follow what the Tenth Circuit did, which is recognizing binding precedent, but of course, if the panel would like further briefing on the best meaning of the statute. I'll emphasize, too, the agency's... I was trying not to interrupt you, but it occurs to me that... Further briefing can help a court decide more quickly. It doesn't necessarily... I mean, if the court asks for it, you have to presume that the court believes it to be of value in resolving the case, and that might actually help get it resolved more quickly. I don't disagree with that, Your Honor, and I didn't mean to sound like I was pushing back too strongly. I was just reminding the court, obviously, both sides here have asked for a quick decision. We're going to honor the deadline that we gave ourselves. I appreciate that, Your Honor. Well, I assure you. I'll say a couple of things, and then I would like to return to the spending clause arguments in particular. The first just being on this point, the regulatory requirements at issue here have been in place for the majority of the Title X program's history. They reflect interpretations of the statute going back to its inception, and grantees such as Tennessee complied with this requirement for decades. Can I ask you just kind of a technical question? So they talk about getting a five-year grant, and you talk about annual grants, and can you just explain to me how this works, and why the annual is... You think the annual is the way we should look at it? Yes, Your Honor. Title X grants are made one year at a time, and making a grant, it's very clear the regulations on the grant spell this out specifically, does not entitle anyone to continued Title X funding. Okay. So that's not surprising. So what is the five-year deal? Is that like saying you're eligible for the next five years? So generally, it's saying, okay, we're going to fund you one year at a time, and generally, when you make a grant, it might be, okay, for five years, this might be a non-competitive process. You submit us to your application. We'll make sure the boxes are checked, and you don't have to reenter the competitive process. But that's a period of non-competitiveness, is the import of the five years? Yes, Your Honor. Okay. That's helpful. On the spending clause, I'll go back to that. The Tenth Circuit, again, walked through these questions. We're going to do it ourselves, too. Exactly. So I get the point that they did that. Yes, Your Honor. And I... I mean, registered. Certainly. I'll remark on Bennett, because Tennessee relies heavily on some language from the Supreme Court in there. The court there is talking about, you know, reluctance to conclude that the agency could go and recoup funding based on a later adopted agency interpretation that wasn't in place at the time the grant was made. That's obviously not the circumstance that we have here. This regulatory requirement was indisputably in place at the time that Tennessee applied for and received its grant funding. So I mean, it's a 2021 rule, right? Yes, Your Honor. So it came out in 2021? It was published, I believe, in October and became effective in November, and then would have applied to the 2022 grant cycle in which Tennessee applied for and received funding for. All right. So the 2022 is when the agency makes that five-year kind of determination? That's when that starts, at least? I believe that that's what... So it's after the rule came out? Yes. Okay. So, again, these kind of, you know, regular statutes that provide, you know, that grants spending is subject to agency regulations. This is common across the U.S. Code, including, you know, the conditions on Medicare and Medicaid spending that the Supreme Court discussed in the Biden versus Missouri case. Can I ask you a question about 1008 again? Sure. A substantive question. So the current rule, if I recall correctly, says that it mandates referrals to an abortion provider if the patient asks for one, right? Factual information, such as a name, address, telephone number, upon a patient's request, yes. Okay. But it says that the program can't subsidize or provide transportation or further affirmative action, it says? Yes. And, I mean, further, it's saying that in reference to the referral, as I read it. And so I just wonder, why is the referral different from those other things? In the sense that they are all concrete steps toward a particular outcome, namely an abortion. And so, you know, if an agency, I mean, why doesn't that make it a method of family planning for that program? If, you know, all those things are, they're not just information and now you decide. They're all concrete steps towards a particular method. And so why doesn't that make the method part of the program? I guess I'm not totally sure what Your Honor is referring to in all those things. I guess I'll just speak to the... Well, it's, you know, so you have the prohibitions. You can't subsidize. You can't give transportation. You can't advocate. But that's, but you can refer. And so my point is, referral, just like the other things, is a concrete step toward getting an abortion. And so all those things, if it's a concrete step toward a particular method, why isn't that method one that the program, you know, uses? Those constraints, Your Honor, they're constraints on, I think they're informing and constraints on the type of referral that we're talking about here. Again, it's, you know, name, address, telephone number, factual information. And HHS explained in its rule that this kind of referral requirement is the natural outgrowth of the non-directive counseling required by the rule. So what happens, you know, is a patient goes into a Title X clinic. This is, in many instances, low-income women. This is their access to medical services. They ask a doctor, you know, I would like to hear, you know, my options. The rule says, you know, if the patient asks for the opportunity, provide them non-directive counseling on the following options. You talk through, provide neutral, factual information. And if, in the course of that process, the patient is talking to their doctor and saying, you know, thank you for providing me that information I would really like to know about option X, it's giving factual information, name, address, telephone number. Again, the agency explained in its rule that's the logical outgrowth of what happens in the counseling process. And of course here, the agency explained to HHS, sorry, the agency explained to Tennessee that if it didn't want providers in its programs to themselves be providing this kind of non-directive options counseling and referral, they could give patients a 1-800 number to call. And then operators, third-party operators on the hotline could provide that information. Yeah, I understand your argument. It just seems like referral, referral is a concrete step towards the procedure itself in a way that generally providing information about options isn't. And, you know, I'll emphasize, you know, these arguments were raised in the, you know, Ohio versus Becerra case, the facial requirement to the rule. What it's worth, I'll just tell you, Ohio said we're not going to call balls and strikes here because, because Russ says anything's, anything's a strike or a ball, whichever one it would be. Right. I guess I'll emphasize that, you know, this kind of factual information provided as part of the counseling process, it's not furthering or promoting anything, there are restrictions on what can be provided. This again reflects interpretations of the statute that have gone back to its inception. And, you know, this again is medical services in the context of someone visiting a provider. You know, if there's a cancer screening and you refer someone, you know, give you someone the name of a, you know, a cancer service somewhere in another state. If a program refers a patient to an adoption agency, does the program use adoption as a method of family planning? Again, I think, Your Honor, the point being, you know, if... Well, what's a yes or no? I mean, it's within the context of the Title X program, the relevant service that we're talking about is non-directive options counseling and giving patients factual information in the context of that. What's a yes or no? I mean... The answer is no. I guess I'm hesitant in... It's not, adoption's not a method when... Not within the title, within the Title X program, Your Honor. Again, the restrictions from Section 1008 obviously put limits on what can be done with respect to, you know, furthering, promoting abortion. This is about factual, neutral information by a medical provider. If the program refers a patient to an abortion, I mean, the question is, does a program use abortion as a method of family planning when it refers a patient to an abortion provider? I mean, it just, it seems to be fairly commonsensical that the answer is yes, just as it is for the adoption agency. I think the answer is no, Your Honor, and again, I'm a little bit hesitant, again, to go through everything in the sense that all of this was aired in Ohio and it hasn't been fully aired in this case. No, but you've got to humor me with merits responses in these agency cases. Now more than ever. I'll say, you know, if there, I think, you know, an analogy, this is a Title X project to establish with Title X funds and you have the services that are provided within the Title X project. You know, if you went, if someone had, you know, a dentist had a clinic on the weekends that they gave free cleanings, they gave services within that clinic and you went to the clinic and you were like, I would like a root canal and the dentist says, I don't provide root canals in this free clinic. This isn't what I do. I'll tell you, I can give you the name, address, and a telephone number of someone who provides a root canal. I was in the Ohio case. Yes, Your Honor. Okay. I'm done. All right. Thank you. Judge Kethledge, you're right. If a woman walks into a Title X clinic and says, I want to know my options, I'm pregnant, and they say, here's prenatal care, abortion, and adoption. Abortion is, the program is one where abortion is a method of family planning. Well, you know, I mean, it's one thing to argue that in the abstract. It's another to argue it with the rider alongside. And I know the rider's after, and how does that amend what came before? I mean, I understand that, but boy, I mean, that's Congress pretty clearly saying, if it's non-directive, it's okay. And I think that hypo is non-directive. The patient, you know, if she then says, I want an abortion, and they say, okay, here's a provider and the address and so on, that could be different. But what you just said is non-directive. Well, the reason why this, I think if we step back and just look at the events post-OBS in this case, you know, the government wants to make this a factual, dry issue. This was expressed directive to override state abortion policies post-OBS using Title X. We know that from the executive orders and from the statements about Title X. So I do think it implicates state sovereignty in the way that is troubling, given the delegation that the agency is purporting to assert here. On Chevron, I'm not sure I understand how the government can both say Ohio and Rust are binding, which said the abortion condition was ambiguous, and then say the abortion condition is so clear that it satisfies the Spending Clause clear statement rule. And just on its own terms, I think you're right, Judge Kethledge, the Chief used that opinion language in Loper-Bright very carefully. Otherwise... That was just beautifully clear. Well, otherwise, if you just think about it, if we're supposed to apply Chevron's holding with respect to statutory ambiguity moving forward, then Chevron really isn't overruled because there's scores of statutes that have been held ambiguous, both at the Supreme Court and the circuit level, that Chevron, Loper-Bright would have no effect. On the procedural posture, the one thing I would urge this court not to do is allow Tennessee's funding to continue to be denied based on an improper reading of the statute, which we submit would be going on here, and the equities are heavily in our favor. Abortion is not part of Title X, yet Tennessee is having $35 million in its entire program defunded that does so much more than abortion, because it can involve abortion, so to have the abortion tail kind of wag the Title X dog, for lack of a better word, is an inequitable result for needy Tennesseans. For those reasons, we respectfully seek reversal. Thank you. We appreciate the argument both of you have given.